Big League Analysis, LLC v. Office of the Comm'r of Baseball, 2016 NCBC 66.

STATE OF NORTH CAROLINA

COUNTY OF WAKE

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 16800

BIG LEAGUE ANALYSIS, LLC, a North
Carolina Limited Liability Company,
   Plaintiff,

v.

THE OFFICE OF THE COMMISSIONER OF
BASEBALL, an Unincorporated Association
d/b/a Major League Baseball; UNITED
STATES BASEBALL FEDERATION, INC., a
Michigan Corporation; and NOAH GARDNER,
an Individual,
   Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**OPINION AND ORDER**

THIS CAUSE, designated a mandatory complex business case by Order of the Chief Justice of the North Carolina Supreme Court, pursuant to N.C. Gen. Stat. §7A-45.4(b) (hereinafter, references to the North Carolina General Statutes will be to "G.S."), and assigned to the undersigned Special Superior Court Judge for Complex Business Cases, comes before the Court upon Defendants' Consolidated Motion to Dismiss pursuant to Rules 12(b)(2) and 12(b)(3) of the North Carolina Rules of Civil Procedure ("Rule(s)"), or, Alternatively, to Stay the Action pursuant to G.S. § 1-75.12(a) ("Motion to Dismiss"). On May 18, 2016, the Court held a hearing on the Motion to Dismiss.

THE COURT, after considering the Motion to Dismiss, the briefs in support of and in opposition to the Motion to Dismiss, the arguments of counsel, and other appropriate matters of record, concludes that the Motion to Dismiss should be GRANTED for the reasons set forth below.

*Manning, Fulton & Skinner, PA by Michael T. Medford, Judson A. Welborn, and Natalie M. Rice for Plaintiff.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, LLP by James T. Williams, Jr. and Craig D. Schauer for Defendants.*

McGuire, Judge.

### FACTUAL AND PROCEDURAL BACKGROUND

1. Plaintiff Big League Analysis, LLC (Plaintiff or "BLA") is a limited liability company organized under the laws of North Carolina with its headquarters in Wake County, North Carolina. Tyson Hanish ("Hanish") is the manager and CEO of BLA.

2. The Office of the Commissioner of Baseball ("Commissioner's Office") is an unincorporated association whose members are the thirty Major League Baseball Clubs. The Commissioner's Office is responsible for the administrative and operational matters relating to Major League Baseball, and is headquartered in New York, New York.

3. The United States Baseball Federation, Inc. ("USA Baseball") is a corporation created under the laws of Michigan with its headquarters in Durham, North Carolina. USA Baseball is the national governing body for amateur baseball. Nearly every major national amateur baseball organization in America is a USA Baseball national member organization.[1]

4. Major League Baseball Advanced Media, L.P. ("MLBAM") is the internet and interactive media company of Major League Baseball, and is

---

[1] USA BASEBALL, http://www.usabaseball.com/about/ (last visited Aug. 25, 2016).

headquartered in New York, New York. Despite its central role in the transactions and conduct alleged in this lawsuit, Plaintiff has not made MLBAM a defendant in this action.

5. Noah Garden ("Garden") was the Executive Vice President of Business for MLBAM until approximately March 2015, at which time he became Vice President of Business for the Commissioner's Office. Garden is a resident of New Jersey, and has never lived in North Carolina.

6. On June 1, 2012, Plaintiff and MLBAM entered into a written contract ("Development Agreement").[2] Neither the Commissioner's Office nor USA Baseball were parties to the Development Agreement. The Development Agreement provided the terms under which Plaintiff would develop and operate the MLB.com Academy, which would be featured and marketed on the MLB.com website.[3] The Complaint describes the MLB.com Academy as "a digital baseball video analysis product and a membership portal in which users would be able to login and upload hitting and pitching videos, and BLA would provide to the user images, videos, drills, and instructional notes."[4]

7. Under the Development Agreement, MLBAM granted Plaintiff a non-exclusive license to "use, copy, reproduce and distribute" certain trademarks and trade names associated with Major League Baseball in connection with the MLB.com

---

[2] Defendants filed a redacted copy of the Development Agreement with the Court on April 6, 2016.

[3] Verified Complaint ("Ver. Compl.") ¶ 9.

[4] *Id.* at ¶ 10.

Academy.[5] The Development Agreement prohibited MLBAM, with certain exceptions, from creating other products or services competitive with or substantially similar to the online instructional products and services provided by Plaintiff. The Development Agreement also restricted MLBAM from disclosing Plaintiff's "Confidential Information," but expressly authorized disclosure of such information by MLBAM to "any MLB Entity" and their employees "who need to know for business purposes related to this Agreement," subject to such party's agreement not to disclose the Confidential Information.[6] The Development Agreement defined Confidential Information, in relevant part, as "trade secrets of each Party, any information relating to each Party's product plans, designs, ideas, concepts, costs, prices, finances, marketing plans, business opportunities, personnel, research, development or know-how and any other technical or business information of each Party."[7]

8.      Finally, the Development Agreement contained a forum selection clause which provided as follows:

> The validity, construction, and enforceability of this Agreement shall be governed by the laws of the State of New York applicable to contracts entered into and performed entirely within that State. The United States District Court for the Southern District of New York and the Supreme Court of the State of New York, sitting in New York County, shall be the exclusive jurisdictions and venues for any dispute arising directly or indirectly from the relationship created or the transactions contemplated by this Agreement. Each of the Parties consents to the jurisdiction and venue of any such court and waives any argument that any such court does not have jurisdiction over such Party or such dispute or that venue in any such forum is not appropriate or convenient.[8]

---

[5] Development Agreement 3–4.
[6] Development Agreement 12–13.
[7] *Id.* at 11.
[8] *Id.* at 23.

9.      In reliance on the Development Agreement, Plaintiff located investors and raised capital to finance development of the MLB.com Academy.

10.     In early 2013, Garden notified Plaintiff that the Commissioner's Office[9] had complained about BLA's use of the name "MLB.com Academy" in marketing its services, but would be amenable to BLA's use of the name "MLB.com Digital Academy." Plaintiff alleges that the Commissioner's Office was not a party to the Development Agreement and did not have "authority to interfere" with the Agreement.[10]   Despite its contention that the use of "MLB.com Academy" in marketing its services was pre-approved, in March 2013 Plaintiff agreed to rebrand to the MLB.com Digital Academy name.

11.     In July 2013, MLBAM notified BLA that the Commissioner's Office had complained about BLA's plans to market the MLB.com Digital Academy at the 2013 College World Series ("CWS"). Plaintiff alleges that "BLA had the right to use the approved MLB.com Academy word mark . . . and was not required to seek the [ ]

---

[9] Plaintiff alleges that "MLBAM and the MLB Commissioner's Office are separate and distinct entities and not otherwise related." Ver. Compl. ¶ 82.  Defendants have filed affidavits that state the Commissioner's Office "is an unincorporated association of the 30 [Major League Baseball] Clubs," Garden Aff.¶ 9, and "is an unincorporated association whose members are the 30 Major League Baseball Clubs." Brumm Aff. ¶3.  The Court notes that the question of whether the Court can consider information outside the pleadings in ruling on a motion under Rule 12(b)(3) is somewhat unclear. *Compare Chow v. Crowell*, 15 N.C. App. 733, 736, 190 S.E.2d 647, 649 (1972) (reversing transfer of venue where prevailing party filed only an unverified motion in the face of evidence filed by the opposing party) *with McCrary Stone Serv., Inc. v. Lyalls*, 77 N.C. App. 796, 799, 336 S.E.2d 103, 105 (1985) (limiting consideration of the propriety of the selected venue to the allegations contained in plaintiff's complaint). The Court's reference to affidavits presented by Defendants in this case is primarily to provide background, and the information provided in these affidavits is not necessary to the Court's ultimate conclusion that the Motion to Dismiss should be granted based on equitable estoppel.
[10] *Id.*

Commissioner's Office's approval. . ." and that the Commissioner's Office "intentionally interfered with BLA's [ ] marketing during the CWS. . ."[11]

12. In September 2013, Plaintiff began developing the "MLB.com Digital Academy Coaches Certification Course" as part of the services to be offered under the Development Agreement.[12] Plaintiff discussed with USA Baseball the possibility of a partnership between Plaintiff and USA Baseball on this course. In March 2014, MLBAM gave BLA approval to develop MLB.com Digital Academy Coaches Certification Course. USA Baseball had not yet committed to a partnership, so Plaintiff decided to proceed in developing the MLB.com Digital Academy Coaches Certification Course without USA Baseball.

13. In July 2014, Plaintiff launched myPitch® on MLB.com. Unbeknownst to Plaintiff at the time, MLBAM, the Commissioner's Office, and USA Baseball were simultaneously working together to develop Pitch Smart®, a competing pitching safety website.[13] Plaintiff alleges the development of Pitch Smart® was a violation of the exclusive rights to develop instructional content that it had been granted by the Development Agreement.[14]

14. Following the launch of the MLB.com Digital Academy Coaches Certification Course, the dispute between Plaintiff and the Commissioner's Office over Plaintiff's right to use various MLB related marks continued. In September 2014, the Commissioner's Office notified Plaintiff of its demand that the certification

---

[11] *Id.* at ¶ 21.
[12] *Id.* at ¶¶ 23–24.
[13] *Id.* at ¶ 34.
[14] *Id.*

program be marketed solely as the "Big League Analysis Coaches Certification Course," without reference to MLB.com. Plaintiff alleges that this notification occurred six months after MLBAM granted Plaintiff permission to develop the Coaches course as originally named.

15. In connection with the development of the MLB.com Digital Academy Coaches Certification Course, Plaintiff sought the involvement of Dr. Glenn Fleisig, a sports medicine expert with the American Sports Medicine Institute ("ASMI"). According to the Complaint, Dr. Fleisig affirmed his and ASMI's support for the program, but noted that he wanted to receive clearance from MLBAM and the Commissioner's Office for ASMI to participate before committing to participate in the Coaches Certification Course. After further negotiation and discussion, MLBAM decided to move forward with the MLB.com Digital Academy Coaches Certification Course, and Garden instructed Plaintiff to submit a transcript and full scope of the Coaches Certification Course to the Commissioner's Office for approval. Plaintiff alleges that the Commissioner's Office interfered with the Development Agreement by requiring review of the course.

16. The day after MLBAM requested that Plaintiff submit the Coaches Certification Course to the Commissioner's Office, the Commissioner's Office and USA Baseball announced the launch of the Pitch Smart® website. Pitch Smart® was "substantially similar to" and "in competition with" Plaintiff's myPitch® product.[15]

---

[15] *Id.* at ¶¶ 45, 46.

17.    Plaintiff alleges that in December 2014, Garden moved from MLBAM to a position with the Commissioner's Office as Executive Vice President of Business, but that this information was not provided to Plaintiff.[16]

18.    In December 2014, Plaintiff provided to Garden and MLBAM "a binder containing the details of BLA's MLB.com Digital Academy Coaches Certification Course for MLBAM's approval."[17]   The material provided by Plaintiff "included creative renderings, home page examples, instructional courses, mobile navigation, expert information and the course contents outline."[18]   MLBAM represented that it could not approve the course without approval by the Commissioner's Office, and requested that Plaintiff upload and digitally deliver the entire program for review. Plaintiff alleges, on information and belief, that MLBAM shared the uploaded digital materials with the Commissioner's Office.

19.    In late January 2015, MLBAM informed Plaintiff that the Commissioner's Office approved the launch of the MLB.com Digital Academy Coaches Certification Course without any changes. Hanish emailed Dr. Fleisig to notify him that Plaintiff had approval to proceed with developing the MLB.com Digital Academy Certification Course. In response, Dr. Fleisig indicated that he needed the approval of the Commissioner's Office to collaborate with Plaintiff based on a previous relationship involving, among other projects, the Pitch Smart® website. In the

---

[16] Garden has submitted an affidavit stating that he assumed his position with the Commissioner's Office in or around March 2015. Garden Aff. ¶ 3. Garden contends that despite the change, he maintained all of the duties of his former role with MLBAM. *Id.* at ¶ 5.

[17] Ver. Compl. ¶ 49.

[18] *Id.*

response email, Dr. Fleisig copied Chris Marinak, an official in the Commissioner's Office. Marinak then emailed Hanish, stating that the Commissioner's Office was developing its own coach's certification program with Dr. Fleisig and ASMI. Plaintiff alleges that Marinak's response was when Plaintiff "first discovered that the [ ] Commissioner's Office had been secretly working to develop its own coaches certification course using BLA's own advisors, concepts, course content and material that it had obtained from MLBAM."[19]

20.     Notwithstanding the Commissioner's Office and USA Baseball's development of a competing program, in March 2015, Plaintiff launched its MLB.com Digital Academy Coaches Certification Course. Shortly thereafter, USA Baseball sent an email to its national member organizations stating that Plaintiff was a licensee of MLBAM and that any correspondence or content sharing with Plaintiff was not connected to or endorsed by USA Baseball or the Commissioner's Office, and was not related to the coaching certification program sponsored by USA Baseball.[20] After learning of this email, Hanish attempted to negotiate a resolution with the Commissioner's Office and USA Baseball, but negotiations ultimately broke down. In June 2015, the Commissioner's Office informed Plaintiff that the Commissioner's Office was no longer interested in pursuing an amicable resolution. One week later, the Commissioner's Office and USA Baseball launched playball.org®, an educational website in competition with Plaintiff's products. Plaintiff alleges that this program

---

[19] *Id.* at ¶ 61. Plaintiff alleges that USA Baseball was working with the Commissioner's Office on its coaches certification course. *Id.* at ¶ 63.
[20] *Id.* at ¶ 72.

specifically contains many of the same features and content contained in Plaintiff's program and for which it charges a subscription fee. Plaintiff alleges that "USA Baseball and the [ ] Commissioner's Office wrongfully misappropriated BLA's Confidential Information to USA Baseball's and the [ ] Commissioner's Office's advantage and in violation of BLA's rights under the Agreement."[21]

21. On December 21, 2015, Plaintiff filed its Verified Complaint alleging that Defendants repeatedly interfered with Plaintiff's rights under the Development Agreement, and misappropriated and misused Plaintiff's Confidential Information to create competing baseball instructional products in violation of its rights under the Development Agreement. The Verified Complaint asserts the following claims for relief: tortious interference with contract against all Defendants; fraud and negligent misrepresentation against the Commissioner's Office and Garden; conversion against all Defendants; civil conspiracy against all Defendants; misappropriation of trade secrets against all Defendants; unfair and deceptive trade practices against all Defendants; punitive damages against all Defendants; and permanent injunction against all Defendants.

22. On February 17, 2016, MLBAM initiated a declaratory judgment action against BLA in the Supreme Court of New York, County of New York, specifically requesting a declaration that MLBAM has not breached the Development Agreement and has not improperly disseminated or misappropriated Plaintiff's Confidential Information or trade secrets.[22]

---

[21] *Id.* at ¶ 79.
[22] Garden Aff. ¶ 29, Exh. C.

23. On February 19, 2016, Defendants filed the Motion to Dismiss, seeking dismissal of this action based on improper venue pursuant to the forum selection clause in the Development Agreement. Defendants also seek dismissal of the claims against Garden on the grounds of lack of personal jurisdiction. Alternatively, Defendants request that this action be stayed in favor of the action for declaratory judgment currently pending in New York. The Motion to Dismiss has been fully briefed and a hearing has been held. The Motion to Dismiss is therefore ripe for determination.

## DISCUSSION

A. *Defendants' Contentions.*

24. In moving to dismiss the Verified Complaint, Defendants contend as follows:

(a) Defendants should be permitted to enforce the forum selection clause in the Development Agreement and the claims should be dismissed as to all Defendants on the grounds of improper venue;

(b) The Court lacks personal jurisdiction over Garden because he has insufficient minimum contacts with North Carolina to satisfy due process requirements; and,

(c) Even if the Court does not dismiss the Complaint, the Court should stay this action in favor of the lawsuit filed by MLBAM in New York.

B. *Plaintiff's Contentions.*

25. In opposing the Motion to Dismiss, Plaintiff contends as follows:

(a) Defendants cannot enforce the forum selection clause because they are neither signatories/parties to the Development Agreement, nor corporate affiliates of MLBAM.

(b) USA Baseball cannot enforce the forum selection clause on the basis of equitable estoppel because its claims do not arise solely from the rights and obligations created by the Development Agreement.

(c) Garden has sufficient contacts with North Carolina because he knowingly dealt with Plaintiff and Hanish, and he sent several emails to Hanish in North Carolina.

(d) This action should not be stayed.

C. *Motion to Dismiss for Improper Venue.*

26.     A challenge to venue based on a forum selection agreement is properly raised by motion under Rule 12(b)(3). *Lendingtree v. Anderson*, 228 N.C. App. 403, 408, 747 S.E.2d 292, 297 (2013). Rules 12(b)(3) and 12(h), read in conjunction, require that a party raise an objection of improper venue in either its answer or in a pre-answer motion pursuant to Rule 12, whichever the party files first. *Id.* at 409; *Miller v. Miller*, 38 N.C. App. 95, 97, 247 S.E.2d 278, 279 (1978) (Rule 12(b)(3) "requires that the motion be made at or before the time of filing of an answer."). Defendants have properly challenged venue by raising the issue in a pre-answer motion pursuant to Rule 12(b)(3).

27.     The general rule is that mandatory forum selection clauses are enforced in North Carolina. *Lendingtree*, 228 N.C. App. at 408, 747 S.E.2d at 297.

"[M]andatory forum selection clauses recognized by our appellate courts have contained words such as 'exclusive' or 'sole' or 'only' which indicate that the contracting parties intended to make jurisdiction exclusive." *Printing Servs. of Greensboro, Inc. v. Am. Capital Group, Inc.*, 180 N.C. App. 70, 74, 637 S.E.2d 230, 232 (2006) (citation omitted).  Here, the forum selection clause clearly provides that the specified New York courts shall be the "exclusive jurisdictions and venues" for certain disputes.  The Court therefore concludes that the forum selection clause in the Development Agreement is mandatory.

28.    Once it is established that a forum selection clause is mandatory, a party "seeking to avoid enforcement of a forum selection clause carries a heavy burden and must demonstrate that the clause was the product of fraud or unequal bargaining power or that enforcement of the clause would be unfair or unreasonable." *Perkins v. CCH Computax, Inc.*, 333 N.C. 140, 146, 423 S.E.2d 780, 784 (1992), *superseded in part by statute*, N.C. Gen. Stat. § 22B-3 (2016).[23] Plaintiff does not contend that it was fraudulently induced to enter into the forum selection agreement nor that MLBAM secured the agreement due to its greater bargaining power. Instead, Plaintiff argues that Defendants should not be able to enforce the forum selection clause because they did not sign and were not parties to the Development Agreement, nor are they corporate affiliates of MLBAM.  Defendants argue that because

---

[23] *Perkins* has been superseded in part by statute. *See* N.C. Gen. Stat. § 22B-3 (2007); *Szymczyk v. Signs Now Corp.,* 168 N.C. App. 182, 186 n.2, 606 S.E.2d 728, 732 n.2 (2005).  The statute provides that (with limited exceptions) forum selection clauses contained in contracts entered into in North Carolina are void and unenforceable. N.C. Gen. Stat. § 22B-3. In this case, however, Plaintiff does not contend that the Development Agreement was entered into in North Carolina, or that § 22B-3 is otherwise applicable to this action.

Plaintiff's claims against them arise from and rely on the terms of the Development Agreement, and are intertwined with the conduct of MLBAM, equitable estoppel principles warrant allowing Defendants to enforce the forum selection clause in this action.

D. *Enforcement of the Forum Selection Clause by Non-Parties.*

29.     Plaintiff's argument that Defendants cannot enforce a forum selection clause because they are not signatories or parties to the Development Agreement must fail.  It is well settled that, in appropriate circumstances, a nonsignatory can enforce a forum selection clause contained in a contract against a signatory to that contract. *Speedway Motorsports v. Bronwen Energy Trading*, 2009 NCBC LEXIS 17, at *15 (N.C. Super. Ct. Feb. 18, 2009) ("the Court concludes that the common law principles applied in North Carolina to extend the reach of arbitration agreements may also be applied to forum selection clauses" to allow a nonsignatory to enforce the forum selection clause); *Adams v. Raintree Vacation Exch., LLC*, 702 F.3d 436, 440 (7th Cir. 2012) (interpreting reach of forum selection clause by analogizing to "the parallel situation of an arbitration clause" and holding nonsignatory could enforce forum selection); *Brantley v. Republic Mortgage Ins., Co.*, 424 F.3d 392, 395–96 (4th Cir. 2005) (holding nonsignatory could enforce arbitration clause against party to contract); *Ellen v. A.C. Schultes of Md., Inc.*, 172 N.C. App. 317, 320, 615 S.E.2d 729, 732 (2005) ("well-established common law principles dictate that in an appropriate case a nonsignatory can enforce, or be bound by, an arbitration provision within a contract executed by other parties" (*citing Washington Square Sec., Inc. v. Aune*, 385

F.3d 432, 435 (4th Cir. 2004))). Courts have noted that foreclosing non-parties from enforcing these provisions would render them essentially meaningless by allowing a signatory to evade the contractual forum selection clause by artful pleading and the omission of key parties. *See Brantley*, 424 F.3d at 396; *Adams*, 702 F.3d at 440.

30. Similarly, Plaintiff's contention that Defendants cannot enforce the forum selection clause because they are not corporate affiliates of MLBAM[24] also fails. While corporate affiliation has been recognized as a basis for allowing a third-party to a contract to enforce a forum selection (or arbitration) clause, the case law does not support the position that corporate affiliation between the third-party seeking to enforce a forum selection clause and a party to the contract is required in order to enforce such a clause. *Adams,* 702 F.3d at 439–43 (finding that one third-party could enforce forum selection agreement because it was corporate affiliate of signatory to the contract and another third-party could enforce on the basis of an alleged conspiracy between the third-party and a signatory to defraud the plaintiffs); *Brantley*, 424 F.3d at 396–97 (recognizing that unaffiliated defendant third-party could enforce arbitration agreement under theory of equitable estoppel but concluding that defendant failed to satisfy elements for equitable estoppel); *Ellen*, 172 N.C. App. at 320–23, 615 S.E.2d at 732–33 (same); *Speedway Motorsports*, 2009 NCBC LEXIS 17 at *14–16 (Third-party to contract could enforce forum selection clause against signatory on equitable estoppel grounds even though it was not a corporate affiliate of signatory). Accordingly, the Court concludes that Defendants

---

[24] Pl.'s Br. Opp. to Mot. to Dismiss 5–8.

may be able to enforce the forum selection clause in the Development Agreement against Plaintiff even if they are not corporate affiliates of MLBAM.

31.     The Fourth Circuit Court of Appeals has held that under the equitable estoppel analysis, allowing enforcement of a forum selection clause by a nonsignatory is appropriate in two circumstances. "First, equitable estoppel applies when the signatory to a written agreement . . . must 'rely on the terms of the written agreement in asserting [its] claims against the nonsignatory.'" *Brantley*, 424 F.3d at 395–96 (citation omitted). This arises where "each of a signatory's claims against a nonsignatory 'makes reference to' or presumes the existence of the written agreement, the signatory's claims 'arise[] out of and relate[] directly to the [written] agreement . . .'" *Id.* at 396. In the second circumstance, enforcement by a nonsignatory is appropriate "when the signatory . . . raises allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Id.*  This Court has cited the *Brantley* standard with approval while also recognizing a very similar, but slightly different, standard originating in the Eleventh Circuit. *Speedway Motorsports*, 2009 NCBC LEXIS 17 at *14–15 ("[A] nonsignatory to a contract may, on grounds of equitable estoppel, invoke an arbitration provision contained therein where there is a 'close relationship between the entities involved' and where the claims against the nonsignatory are 'intimately founded in and intertwined with the underlying contract obligations'" (citing *Sunkist Soft Drinks v. Sunkist Growers*, 10 F.3d 753, 757 (11th Cir. 1993))).

i.        <u>Commissioner's Office and Garden</u>.

32.    Applying these principals here, it is clear that the Commissioner's Office and Garden should be permitted to enforce the forum selection clause against Plaintiff. Indeed, Plaintiff devotes little of its argument in its brief to contending otherwise.[25] First, all of the allegations regarding Garden involve his statements and conduct in his capacity as an official of MLBAM or the Commissioner's Office, and the Court concludes that Garden may enforce the forum selection agreement to the same extent as it can be enforced by MLBAM or the Commissioner's Office. *Ellison v. Alexander*, 207 N.C. App. 401, 412 -13, 700 S.E.2d 102, 111 (2010) (finding that an individual nonsignatory may enforce arbitration agreement where "his alleged liability arises from his actions as an agent of the corporate signatory to the arbitration agreement").

33.    Plaintiff's claims against the Commissioner's Office and Garden could not be more closely tied to and intertwined with the rights and obligations created by the Development Agreement. The claim for tortious interference against the Commissioner's Office and Garden depends on a finding that they induced MLBAM to breach the Development Agreement. *Griffith v. Glen Wood Co.*, 184 N.C. App. 206, 212, 646 S.E.2d 550, 555 (2007) ("An essential element of a claim for tortious interference with a contract is that 'the defendant intentionally induces the third person not to perform the contract.'"); *Phillips v. Pitt Cty. Mem'l Hosp., Inc.*, 222 N.C.

---

[25] Pl.'s Br. Opp. Mot. Dismiss 16–17.

App. 511, 521, 731 S.E.2d 462, 469 (2012) (noting that tortious interference requires the defendant to actually induce nonperformance of the contract).

34. Plaintiff's fraud and negligent misrepresentation claims against the Commissioner's Office and Garden contain express allegations regarding Plaintiff's rights under the Development Agreement, which involve the terms "Licensed Properties" and "Confidential Information" as defined by the Development Agreement.[26] Similarly, the claims against the Commissioner's Office and Garden for conversion and misappropriation of trade secrets arise from the confidentiality obligations created by the Development Agreement and will require determination of MLBAM's rights to share and the Commissioner's Office's right to use Confidential Information. Finally, Plaintiff's claims for unfair and deceptive trade practices and conspiracy are based upon the same alleged unlawful conduct. Accordingly, the Court concludes that Plaintiff's allegations against the Commissioner's Office and Garden arise out of and directly relate to the Development Agreement.

35. The Court also concludes that there is a "close relationship" between MLBAM, on the one hand, and the Commissioner's Office and Garden, on the other, that supports permitting the Commissioner's Office and Garden to enforce the forum selection clause against Plaintiff. Although Plaintiff alleges that "MLBAM and the [ ] Commissioner's Office are separate and distinct entities and are not otherwise related,"[27] this allegation is belied by the Development Agreement, which is replete with references to Major League Baseball and the Commissioner's Office as entities

---

[26] Ver. Compl. ¶¶ 92, 100, 101.
[27] *Id.* at ¶ 82.

related to and affiliated with MLBAM. The Development Agreement makes it clear the MLBAM is closely affiliated with the Commissioner's office, a fact that is verified by Defendants' evidence regarding the relationship between Major League Baseball, the Commissioner's Office, and MLBAM.[28]

36. Ultimately, the Court concludes that it is "hard-pressed to imagine a closer relationship between parties and alleged wrongs that would justify extending the reach of a mandatory forum selection clause so as to require litigation of all claims related to the dispute in one venue." *Speedway Motorsports*, 2009 NCBC LEXIS 17 at *18. Defendants' Motion to Dismiss the Office of the Commissioner of Baseball and Noah Garden pursuant to Rule 12(b)(3) for improper venue is GRANTED without prejudice.

ii.    USA Baseball.

37. Plaintiff devotes most of its efforts to arguing that USA Baseball cannot enforce the forum selection clause. Like the Commissioner's Office, USA Baseball is neither a party nor a signatory to the Development Agreement. USA Baseball, however, is differently situated from the Commissioner's Office. First, USA Baseball is not a corporate affiliate of MLBAM, the Commissioner's Office, or Major League Baseball. Second, unlike the Commissioner's Office, the Development Agreement does not grant any specific rights to, or impose any obligations upon, USA Baseball.[29]

---

[28] Garden Aff. ¶¶ 8–9; Brumm Aff. ¶¶ 3–5.
[29] From the Court's review, USA Baseball is referred to only once in the Development Agreement. The Development Agreement provides that MLBAM may maintain certain relationships with USA Baseball despite the rights granted to Plaintiff under the Development Agreement. Development Agreement 4–5.

The allegations do not support the conclusion that there is a "close relationship" between USA Baseball and MLBAM. *Speedway Motorsports*, 2009 NCBC LEXIS 17 at \*14–15. The Court, however, does not believe that enforcement of a forum selection clause on the basis of equitable estoppel is limited solely to third-parties who are in a close relationship with a signatory. In *Speedway Motorsports*, this Court cited with approval the equitable estoppel principals recognized by the Fourth Circuit in *Brantley*, neither of which required a close relationship between the third-party seeking to enforce the clause and a signatory.

38.     Plaintiff argues that USA Baseball should not be able to enforce the forum selection clause because Plaintiff's claims against USA Baseball "are not dependent on a finding that MLBAM, as a signatory, breached the Development Agreement."[30] With regard to its claim for tortious interference with contract, Plaintiff contends that it is not required to prove that USA Baseball induced MLBAM to breach the Development Agreement, but only that USA Baseball made Plaintiff's "performance under the Development Agreement more expensive and burdensome."[31] Conduct that made Plaintiff's performance more burdensome, however, would still have to interfere with MLBAM's performance of the Development Agreement. In North Carolina, to establish a claim for interference with contract, a plaintiff must show that the defendant induced a third-party "not to perform the contract." *Phillips*, 222 N.C. App. at 521, 731 S.E.2d at 469; *Griffith*, 184 N.C. App. at 212, 646 S.E.2d at 555; *cf. Lexington Homes, Inc. v. W.E. Tyson Builders, Inc.*, 75 N.C. App. 404, 410–

---

[30] Pl.'s Br. Opp. Mot. Dismiss 13 (emphasis in original).
[31] *Id.* 14-15.

11, 331 S.E.2d 318, 321–22 (1985) (holding that inducement not to perform contract was a required element of claim, but concluding that party alleging interference did not have to prove "breach," but only that third-party "wrongfully *interfered* with [the party]'s rights under the contract" (emphasis in original)). Accordingly, whether or not Plaintiff must show an actual "breach," the tortious interference with contract claims will require Plaintiff to establish that USA Baseball induced the non-performance of, or interfered with rights created by, the Development Agreement. In either case, the claim derives from and is dependent on Plaintiff's rights under the Development Agreement.

39.     Plaintiff's contention that its claims for conversion, misappropriation of trade secrets, and unfair trade practices "do not depend on whether MLBAM breached the Development Agreement" [32] also are unpersuasive. Each of the claims arise directly out of the exclusive rights Plaintiff claims to have under the Development Agreement to develop instructional digital and video content aimed at amateur baseball players, the confidentiality obligations imposed by the Agreement, and Defendants' alleged interference with and violations of those rights. The forum selection clause here covers "any dispute arising directly or indirectly from the *relationship created* or the *transactions contemplated by*" the Development Agreement.[33] As this Court concluded in enforcing a similar, but more narrow, forum selection clause against a signatory "[t]his broad language easily encompasses [the] tort claims because they have their genesis in the … Agreements and related [ ]

---

[32] Pl.'s Br. Opp. Mot. Dismiss 14.
[33] Development Agreement 23 (emphasis added).

contracts." *Speedway Motorsports*, 2009 NCBC LEXIS 17 at *18. Given the repeated incorporation of and reference to the terms of the Development Agreement, and the requirement that to prevail on several of its claims the Court would be forced to interpret the Development Agreement or conclude that MLBAM breached that agreement, the Court concludes that Defendants have sufficiently shown Plaintiff's reliance on the contract to allow USA Baseball to enforce the forum selection clause in that agreement. *See Brantley*, 424 F.3d at 395–96.

40.    Additionally, Plaintiff also has "raise[d] allegations of . . . substantially interdependent and concerted misconduct by both the nonsignatory [USA Baseball] and one or more of the signatories to the contract," *Brantley*, 424 F.3d at 396; *Speedway Motorsports*, 2009 NCBC LEXIS 17, at *15. Plaintiff alleges that Defendants, including USA Baseball, "wrongfully interfered with BLA's right to, possession and use of its Confidential Information" and "wrongfully and intentionally converted and misappropriated BLA's Confidential Information."[34] The Complaint expressly alleges that MLBAM "work[ed] with the MLB Commissioner's Office and USA Baseball in violation of BLA's rights under the [Development] Agreement,"[35] and that the Commissioner's Office and USA Baseball together used the Confidential Information provided by MLBAM to create instructional websites substantially similar to and/or in competition with BLA's services under the Development Agreement.[36]

---

[34] *Id.* at ¶¶ 107 - 108.
[35] *Id.* at ¶ 34.
[36] *Id.* at ¶¶ 45, 78, 108, 124.

41.     The disputes underlying Plaintiff's claims in this lawsuit arise, directly and indirectly, from rights and obligations created by the Development Agreement. At the heart of Plaintiff's Complaint is the contention that it was deprived of rights under the Development Agreement by the concerted and interrelated actions of MLBAM, the Commissioner's Office, Garden, and USA Baseball. Accordingly, Plaintiff's failure to include MLBAM as a defendant in this action has the distinct appearance of being an attempt evade the forum selection clause to which BLA agreed. *Speedway Motorsports*, 2009 NCBC LEXIS 17, at *17–18 (recognizing the principle that a party cannot avoid broad forum selection agreement by "cast[ing] its complaint in tort rather than in contract" (citation omitted)). The Court concludes, for the reasons discussed above, that Plaintiff is equitably estoppel from preventing Defendants' enforcement of the forum selection clause in the Development Agreement, and that all claims asserted in this action fall within the scope of that clause. Therefore, the Court concludes that venue for this action properly lies in New York, and the Motion to Dismiss should be GRANTED based on improper venue. Based on this conclusion, the Court need not address Defendants' personal jurisdiction argument or request to stay this action.

THEREFORE, IT IS ORDERED that the Motion to Dismiss is GRANTED, and the Verified Complaint is DISMISSED WITHOUT PREJUDICE to Plaintiff's rights to bring its claims in either forum provided in the Development Agreement.

This the 29th day of August, 2016.


                                 /s/ Gregory P. McGuire
                                 Gregory P. McGuire
                                 Special Superior Court Judge
                                   for Complex Business Cases